IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MARCUS WALKER, INDIVIDUALLY,
AND ON BEHALF OF
THE WRONGFUL DEATH BENEFICIARIES OF
DE'AUBREY RAJHEEM ROSCOE,
DECEASED                                                              PLAINTIFF

v.                                      CIVIL ACTION NO. 4:20-CV-00156-GHD-JMV

CITY OF INDIANOLA POLICE OFFICER
SHABRIDGET CALDWELL,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY;
CITY OF INDIANOLA POLICE OFFICER
BENNIE MILTON,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
CITY OF INDIANOLA POLICE OFFICER
REGINA STRONG,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY;
THE CITY OF INDIANOLA, MISSISSIPPI;
MEDSTAT EMS CREW MEMBER JONATHAN UPP,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
MEDSTAT EMS CREW MEMBER
ANDREW WALDA,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
MEDSTAT EMS, INC.;
AND JOHN DOES 1-5,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY                DEFENDANTS

**OPINION GRANTING DEFENDANTS MEDSTAT EMS, INC., AND JONATHAN UPP'S
MOTION TO EXCLUDE PLAINTIFF'S EXPERT OBIE MCNAIR, M.D.**

Presently before the Court is the Motion to Exclude Plaintiff's Expert Obie McNair, M.D. [128], filed by Defendants MedStat EMS, Inc. (herein "MedStat"), and Jonathan Upp (herein collectively as "the Medical Defendants"). For the reasons stated below, the Medical Defendants' Motion to Exclude shall be granted.

### I. Factual and Procedural Background

The Plaintiff, who is a resident of Tarrant County, Texas, brings his Complaint on his own behalf and on behalf of the heirs and wrongful death beneficiaries of De'Aubrey Rajheem

1

Roscoe, who died during the events at the heart of this proceeding [1 at ¶ 1]. The Plaintiff is the brother of the Defendant [1 at ¶ 139]. Defendant MedStat is a Mississippi corporation that provides emergency medical services [1 at ¶ 8]. Defendant Upp is a paramedic employed by Defendant MedStat [1 at ¶ 6; 129 at 2].

The facts, as alleged by the Plaintiff, are as follows. On April 24, 2019, at approximately 8:00 p.m., Roscoe was shot on Oak Street in Indianola [1 at ¶ 18]. Defendant MedStat received a call about the shooting at 8:01 p.m., and consequently dispatched some of its crew members to the scene [*Id.* at ¶ 19]. Similarly, at 8:05 PM, the Indianola Police Department ("IPD") received a report about the shooting and dispatched some of its officers [*Id.* at ¶ 20]. These officers arrived on the scene at 8:09 p.m. and spoke with Roscoe, who was lying on his abdomen on the lawn at 608 Oak Street [*Id.* at ¶¶ 21-22]. The officers noted that Roscoe was lying in a pool of blood, and appeared to be shot in his right upper arm and right upper back [*Id.* at ¶ 23]. They questioned him about his injuries [*Id.* at ¶ 24]. At 8:11 p.m., Defendant MedStat's crewmembers, including Defendant Upp, arrived on the scene, where they found Roscoe lying on the ground, awake, alert, oriented, and with no active bleeding [*Id.* at ¶¶ 25-27]. They placed him on a stretcher, and loaded him into an ambulance, where they conducted a more thorough examination of him and found no other obvious signs of trauma [*Id.* at ¶¶ 28-29]. At 8:27 p.m., the ambulance transporting Roscoe and Defendant MedStat's crew members left the scene, heading to the South Sunflower County Hospital; it arrived there at 8:34 p.m. [*Id.* at ¶¶ 30-31]. Roscoe was pronounced dead at 8:56 p.m. [*Id.* at ¶ 32].

To be clear, IPD was called five minutes after the shooting, and its officers arrived at the scene four minutes after receiving the call. Defendant MedStat's medical professionals were called one minute after the shooting, and arrived at the scene ten minutes after receiving the call.

Defendant MedStat's crew members treated Roscoe for sixteen minutes at the scene, and then left the scene in an ambulance heading toward the local hospital.

On September 3, 2020, the Plaintiff filed his Complaint [1]. In it, he alleges three primary causes of action: violations under 42 U.S.C. § 1983 [1 at ¶¶ 33-43]; liability under a theory of negligence and a duty to use reasonable and ordinary care when interacting with the deceased [1 at ¶¶ 44-131]; and intentional infliction of emotional distress [1 at ¶¶ 132-36]. The Plaintiff seeks compensatory damages of $500,000; punitive damages of $500,000; declaratory and injunctive relief; and attorney's fees and costs [1 at 24].

Summary judgment has been granted in favor of Defendants Shabridget Caldwell, Bennie Milton, and the City of Indianola, and they have been dismissed from these proceedings [148]. Similarly, March 22, 2021, the Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice dismissing Defendant Regina Simpson, inaccurately listed in the Complaint as Regina Strong, from this case [79]. There has been incomplete service of process with respect to Defendant Andrew Walda [17; 31; 42], and he has not been active in this case, nor have any of the parties been active toward him, beyond his listing in the Complaint. The Plaintiff has also failed to present further information about the John Doe individuals listed in the Complaint. Thus, the only active defendants remaining in this case are the Medical Defendants.

Against these Defendants, the Plaintiff only brings claims of negligence [1 at ¶¶ 88-125], gross negligence [1 at ¶¶ 129-131], and intentional infliction of emotional distress [1 at ¶¶ 132-36]. More specifically, the Plaintiff alleges that the Medical Defendants had a duty to use reasonable and ordinary care to "ensure timely transport" [1 at ¶ 91] and "avoid delaying the transport" [1 at ¶ 93] of Roscoe to the nearest hospital, and a similar duty to "establish and enforce and/or abide by the established rules and regulations and/or policies and procedures concerning

the timely transport of its patients" [*Id.* at ¶ 109]. Similarly, the Plaintiff alleges that the Medical Defendants had that same duty of reasonable and ordinary care to ensure that Roscoe received the care he needed [*Id.* at ¶¶ 94-95].

On November 4, 2020, Defendant MedStat filed its Answer and Defenses [19]. On December 2, Defendant Upp likewise filed his Answer and Defenses [41]. Following a period of discovery, the Medical Defendants filed their Motion to Exclude on February 23, 2022 [128], along with its accompanying Memorandum in Support [129]. In this Memorandum, the Medical Defendants provide more medical information about the incident [*Id.* at 1]. Roscoe had been shot three times, and one of the bullets had perforated the deceased's liver and right lung, thereby causing a collapsed lung ("pneumothorax" in medical terms) and bleeding in the space between the lung and the chest cavity (a "hemothorax") [*Id.*]. The Medical Defendants also provide details of the treatments and medical actions that they performed on Roscoe prior to his death [129 at 2].

The Medical Defendants agree with the Plaintiff that Defendant MedStat dispatched its personnel—in the case *sub judice* a team comprising Defendant Upp, a paramedic, and Defendant Andrew Walda, an EMS driver— at 8:01 p.m. on the evening in question [*Id.*]. Defendants Upp and Walda then "staged" themselves, meaning that they waited a short distance from the scene of the incident until law enforcement arrived and indicated that the scene was safe for them to begin medical treatment [*Id.* at 2, n. 1]. IPD then gave them the all-clear, and they arrived on the scene at 8:11 p.m.; they made contact with Roscoe—who was then alive, awake, alert, and oriented—at 8:12 p.m. [*Id.* at 2]. Defendant Upp dressed Roscoe's wounds, and then transferred him to a stretcher and into the back of the ambulance [*Id.*]. Defendant Upp administered oxygen via a non-rebreather mask at 8:20 p.m., and then attempted unsuccessfully

4

to obtain vascular access at 8:21 p.m. [*Id.*]. He then attempted to gain peripheral access via an intraosseous device at 8:23 p.m. and 8:24 p.m. but both attempts failed because the catheters bent [*Id.*]. Defendant Upp then noticed that Roscoe was becoming short of breath and that the right side of his chest was moving less than the left side of his chest; this led Defendant Upp to suspect that there was air in the chest cavity that was exerting pressure on the lung [*Id.*]. He successfully performed a needle decompression to let the air escape the chest cavity [*Id.*]. At 8:24 p.m., Upp noticed that Roscoe was in respiratory distress and attempted to intubate him, but this attempt failed because Roscoe was suffering from lockjaw [*Id.* at 3]. Upp and Walda began transporting Roscoe at 8:27 p.m., and they arrived at the hospital at 8:31 p.m. [*Id.*]. Roscoe was pronounced dead at 8:56 p.m. [*Id.*]. The hospital listed Roscoe's cause of death as cardiac arrest due to gunshot wounds [128-2 at 1]; similarly, the State Medical Examiner listed the cause of death as multiple gunshot wounds and the manner of death as homicide [128-3 at 3]. This rendition of the facts agrees with the version presented by the Plaintiff in his Complaint while also providing more details about the medical treatment given to Roscoe.

In their Motion and corresponding Memorandum, the Medical Defendants argue that the Plaintiff's designated expert, Obie McNair, M.D., "should be excluded from offering expert testimony in this case because (1) he is not qualified as an Emergency Medical Services ("EMS") or paramedic; and (2) his causation opinion lacks a sufficient foundation and is inadmissible *ipse dixit*" [129 at 1]. Dr. McNair is a physician who is board-certified in internal medicine and pulmonary medicine [128-5]. On his resume, he does not list any experience, education, or background related to emergency medicine or the standards at play when treating patients in the field and on ambulances [*Id.*]. In depositional testimony, Dr. McNair admitted that he was not, nor had he ever been, a paramedic, and could not articulate the difference

5

between a paramedic and an emergency medical technician [128-6 at 4-5]. He further admitted to a complete lack of knowledge regarding schooling for paramedics and the curriculum in paramedic education programs, and was not able to identify any authoritative textbooks on paramedicine, much less demonstrate a familiarity or knowledge of their material [*Id.* at 5]. He also agreed that the standard of care for a paramedic would be different from the standard of care for a pulmonologist or a doctor of internal medicine [*Id.* at 6]. He stated that he had not reviewed the Central Mississippi Emergency Medical Service District protocols [*Id.* at 5]. These protocols are based on and sourced from Mississippi state law, and they govern the provision of emergency medical services as part of the Rules and Regulations promulgated by the Mississippi Department of Health – Bureau of Emergency Medical Services [129; 128-7].

Dr. McNair further admitted that he does not treat gunshot wounds, and that if he had ever treated a gunshot wound, it would have been while he was a student in 1980 [128-6 at 5]. Later in the deposition, Dr. McNair expounded on the subject, saying, "I'm a pulmonologist. So I don't know why that keeps coming up. I wouldn't be expected, as a pulmonologist, internist, to treat gunshot wounds" [*Id.* at 15] (emphasis added). He likewise explained that he did not provide pre-hospital care, and that he had been involved in treating gunshot victims only after they had been admitted in the hospital, in terms of "managing ventilators and other things related to critical care medicine" [*Id.* at 15].

When asked to cite to anything that says that it would be improper to obtain vascular access or peripheral access prior to transport, Mr. McNair opined based on his training, education, and experience that it would be correct to attempt such a procedure during transport, rather than beforehand, because the emergency medical professionals would be trying to get the patient to the hospital as quickly as possible [128-6 at 10]. But when asked further about this

6

point, Dr. McNair conceded that he was not an EMT; in his words, "I haven't been there. But I know it is done" [*Id.*]. Similarly, when asked to support his opinions in this case by citing to a specific protocol or EMS textbook, Dr. McNair stated, "<u>Well, I'm not an EMS, so I don't rely on EMS textbooks. I am a practicing physician.</u> And anybody in respiratory distress, anybody suspected of having a pneumo, as you pointed out that they were treating and assessing initially, should be on oxygen" [*Id.* at 9] (emphasis added). This distinction between an emergency medicine specialist and a practicing physician recurred later in the deposition when Dr. McNair began discussing Roscoe's dyspnea, the medical term for shortness of breath [*Id.*]. Dr. McNair opined that "[i]f <u>an EMS</u> assesses the patient and find that the patient is dyspneic – that's the key word, dyspneic – and this gentlemen [sic] was dyspneic, he should be placed on oxygen. And I would argue that that is the standard of care with dyspnea" (emphasis added), apparently speaking from the perspective of an emergency medicine specialist [*Id.*]. Dr. McNair was then asked to support this contention [*Id.*]. He responded by citing not to an EMS text, but rather to medical knowledge more generally, saying, "<u>Any pulmonary text…For any physician, ER.</u> I'm sure that an EMT, if they find a patient dyspneic, they could – probably first should assess his oxygen saturation levels. I don't know if that was done, but certainly consider administering oxygen if someone is short of breath. <u>That's protocol. That's common sense</u>" [*Id.*] (emphasis added).

During his deposition, Dr. McNair was also asked about his professional opinion, as stated in his written report on this case, that "[t]he EMS breached the standard of care and/or protocol by staying on scene 16 minutes" [Id. at 11]. When asked to support that contention by citing to a protocol or other literature that would establish the standard of care espoused by Dr.

7

McNair, he did not do so and instead responded more generally that his opinion was based on his experience, education, and training [*Id.*].

On March 19, 2022, the Plaintiff filed his Response in Opposition to the Medical Defendants' Motion to Exclude, along with its corresponding Memorandum in Support of said Response [138; 139]. In this Memorandum, the Plaintiff argues that "the issue in the case at bar is that Roscoe sustained a penetrating trauma from a gunshot wound" [139 at 8]. The Plaintiff further argues that Dr. McNair is qualified to testify on this issue based on his medical degree, board certifications in internal medicine and pulmonary medicine, his eligibility for certification in critical care medicine, and his status as a currently practicing physician. [139 at 7-8]. Likewise, the Plaintiff contends that "Dr. McNair's training and experience as a practicing physician qualifies him to tell the jury the causal link between the breach of the standard and care and/or protocols and Roscoe's death" and that "Dr. McNair's testimony will assist the trial jury to understand the hospital care and treatment Roscoe needed" [139 at 17].

The Plaintiff states that Dr. McNair's opinion regarding the Medical Defendants' alleged breach of the standard of care is "based on his review of the reports, records, medical literature, and his education, training, and years of professional experience" [139 at 8] (emphasis added). However, Dr. McNair does not cite to any literature in his deposition, and the only literature presented by the Plaintiff in their Memorandum provides generalized information about the seriousness of a pneumothorax and the ability of a 19-gauge or larger needle to remove the air trapped in the chest cavity of a patient [139 at 15]. Both points are uncontested by the Medical Defendants. Additionally, the size of the needle used by Defendant Upp is not mentioned in the record and Defendant Upp reported that the needle decompression was successful [*Id.*; 129 at 2].

On April 4, 2022, the Medical Defendants' filed their Rebuttal in Support of their Motion to Exclude [149]. In it, they argue that the "particular topic" and "issues and evidence" in this case concern the standard of care for a paramedic and ambulance company [149 at 2].

The matter is now ready for review.

## II.  Legal Standards

The Federal Rules of Evidence state that an expert witness should be qualified on the basis of their knowledge, skill, experience, training, or education. Fed. R. Evid. 702. Such a witness may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case" [*Id.*]. This rule "assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993)). To evaluate the validity of an expert witness's testimony, district judges must engage in a two-part analysis. *Id.* A district judge must first determine if the testimony is reliable, i.e. "whether the reasoning or methodology underlying the testimony is scientifically valid," and must then determine if the testimony is relevant, i.e. "whether that reasoning or methodology can be properly applied to the facts in issue." *Id.* The first half of this analysis creates a requirement that "implies that the testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." *Id.*

The Supreme Court has pointed to four non-exclusive factors that district judges can use when assessing whether methodology espoused by a potential witness is reliable. *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579, 593-94 (1993). These factors are: "(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* As indicated by Rule 702 and established by the Supreme Court, these analytical practices and a district judge's "basic gatekeeping obligation" apply to all expert testimony, not just "scientific" testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.1999).

The Supreme Court has stated that a district court "must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho Tire*, 526 U.S. at 152. "Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings... [and] 'unjustifiable expense and delay' as part of their search for 'truth' and the 'jus[t] determination' of proceedings." *Id.* at 152-153 (quoting Fed. Rule Evid. 102). Thus, "a district court is not always required to hold a formal *Daubert* hearing." *Carlson v. Bioremedi Therapeutic Systems, Inc.*, 822 F.3d 194, 201 (5th Cir. 2016); see also *Oddi v. Ford Motor Co.*,

10

234 F.3d 136, 153 (3rd Cir. 2000) (holding that there was "no need to conduct a hearing before ruling on the *Daubert* challenges" in a case in which the evidentiary record was sufficient for ruling on said challenges); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001); and *Millenkamp v. Davisco Foods Intern., Inc.*, 562 F.3d 971, 979 (9th Cir. 2009) (stating that "[t]he district court has discretion whether to hold a Daubert hearing in determining whether to admit expert testimony"). However, at a minimum, "a district court must still perform its gatekeeping function by performing some type of Daubert inquiry and by making findings about the witness's qualifications to give expert testimony." *Carlson*, 822 F.3d at 201. Then, it "must create a record of its Daubert inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001).

"The proponent has the burden of establishing, by a preponderance of the evidence, that the pertinent admissibility requirements are met." *U.S. v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003). Conclusory contentions by a potential witness are meritless. *Id.* "The district court is afforded 'the widest possible discretion in deciding whether a witness qualifies as an expert.'" *Koonce v. Quaker Safety Products & Mfg. Co.*, 798 F.2d 700, 721 (5th Cir. 1986) (quoting *Dixon v. International Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985). A district judge's decision in this regard "will not be disturbed on appeal unless it is manifestly erroneous." *Id.* (quoting *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir.1979)).

### III. Analysis

The Court begins by noting that normally in cases like the one *sub judice*, the Court would resolve the issue of expert testimony through a *Daubert* hearing. However, neither party has filed a motion calling for such a hearing. Moreover, the evidence in this matter—specifically the curriculum vitae of Dr. McNair [128-5] and his depositional testimony [128-6]—is

11

undisputed and clearly establishes the extent to which Dr. McNair's opinions can be deemed reliable and relevant in this matter. Therefore, the Court finds that a *Daubert* hearing is unnecessary to rule on the motion presently before it.

The Court finds that, with respect to proffered expert testimony in the matter *sub judice*, the relevant subject matter relates to the standards of care for emergency medicine specialists and paramedics operating in the field and on ambulances. It reaches this finding after noting that the events in question occurred during a medical emergency taking place in the field and on an ambulance, rather than a well-controlled setting like a hospital, medical clinic, or the like. Furthermore, the allegedly insufficient actions were undertaken by a paramedic, emergency medical driver, and emergency medical services company, rather than a hospital physician. As such, these actions must be considered under the standards of that specific profession, rather than related but more generalized sources of knowledge like a medical degree or a tangential specialization like pulmonology that is separate from the field of emergency medicine.

During his depositional testimony, Dr. McNair repeatedly acknowledged his lack of knowledge in the field of emergency medicine. See *supra* Part II. He unequivocally stated that he was not a paramedic, and has neither experience nor education in the field of emergency medicine [128-5]. He likewise failed to cite to any literature or published works pertaining to emergency medicine [*Id.*]. Dr. McNair also conceded that the standard of care for pulmonology and internal medicine—the disciplines in which he does possess specialized knowledge, experience, and training—is different from the standard of care for paramedicine [*Id.* at 6]. Without specialized knowledge of that field, Dr. McNair's opinion is simply irrelevant for the matter at hand, regardless of his medical degree and experience in what might at best be considered an adjacent area of focus. Therefore, because Dr. McNair's opinion lacks relevance

for the facts of this case, he is not qualified—under the jurisprudential standards articulated above—to present his testimony. The Plaintiff's assertion that "Dr. McNair's testimony will assist the trial jury to understand the hospital care and treatment Roscoe needed" [139 at 17] is equally immaterial because this case relates to emergency medical care in the field and on an ambulance, not hospital care and treatment.

Similarly, the Plaintiff's assertion that "Dr. McNair's training and experience as a practicing physician qualifies him to tell the jury the causal link between the breach of the standard and care and/or protocols and Roscoe's death" [*Id.*] also falls short by pointing to Dr. McNair's background as a physician. However, it also misses the mark in a second way because it puts the cart before the horse. The issue is not whether there is a causal link between the alleged breach of the standard of care and Roscoe's death, but rather whether there was a breach of that standard in the first place. As noted above, Dr. McNair is simply not equipped to make such a determination.

Even assuming this were not so, Dr. McNair points to his education, experience, and training in a conclusory fashion and fails to present reliable evidence for the issue at hand. The Court has already discussed Dr. McNair's education, experience, and training above, and found them unsuitable for the case *sub judice*. The sole article provided with his report, titled "Understanding Chest Tube Use for a Pneumothorax," does not relate to the specific standard of care for treatment of this condition by a paramedic in the field when faced with a patient who has an open and bleeding wound from a gunshot, nor does it explain how the Medical Defendants' actions would have breached this standard [138-9]. Aside from Dr. McNair's references to the practice of medicine generally, he does not provide any further clarifications in his depositional testimony for his opinions or explain as to how the specifics of his professional background

connect to the matters on which he is opining. In so doing, he fails to present specific data, facts, principles, or methodologies that have been researched, tested, or generally accepted by the scientific community or another similar community of experts. In other words, Dr. McNair has failed to demonstrate the reliability of his opinions, as required under Rule 702 and the *Daubert* line of cases. Since Dr. McNair has failed to meet this requirement, he is not qualified to testify in this case.

## IV. Conclusion

For the reasons stated above, the Court finds that Dr. McNair fails to meet the requirements for expert testimony as articulated in Federal Rule of Evidence 702 and the *Daubert*, *Kumho Tire*, *Curtis*, and *Wilson* cases. Thus, the Court concludes that exclusion of his testimony is warranted, and that the Medical Defendants' Motion to Exclude Plaintiff's Expert Obie McNair, M.D. [128], shall be GRANTED.

An Order in accordance with this Opinion shall issue this day.

THIS, the 12th day of May, 2022.

_____
SENIOR U.S. DISTRICT JUDGE

14